# United States Court of Appeals
## For the First Circuit

————————————

No. 22-1491

JOSÉ SANTIAGO, INC.,

Plaintiff, Appellant,

v.

SMITHFIELD PACKAGED MEATS CORP.,

Defendant, Appellee,

SMITHFIELD FOODS, INC.,

Defendant.

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Silvia Carreño-Coll, U.S. District Judge]

————————————

Before

Kayatta, Howard, and Thompson,
Circuit Judges.

————————————

Alfredo Fernández-Martínez, with whom Carlos R. Baralt-Suárez and Delgado Fernández LLC were on brief, for appellant.
Ryan David Frei, with whom Garrett Hansbrough Hooe, McGuireWoods LLP, Henry O. Freese-Souffront, Daniel Pérez-Refojos, and McConnell Valdés LLC were on brief, for appellee.

————————————

April 25, 2023

————————————

KAYATTA, **Circuit Judge**.  Puerto Rico's Law 75 governs the relationships between distributors in Puerto Rico and their suppliers.  José Santiago, Inc. ("JSI"), is a distributor of food-service products in Puerto Rico.  It contends that one of its suppliers violated Law 75 by refusing to continue filling JSI's orders unless JSI agreed to a written distribution agreement that would limit the products it could order.  JSI filed a motion for a preliminary injunction under Law 75, which the district court denied.  Although we disagree with some of the district court's reasoning, we uphold its ultimate conclusion that a preliminary injunction is not warranted here.  Of course, any conclusions bearing on the merits contained in this opinion should be understood as nothing more than "statements as to probable outcomes." Wine & Spirits Retailers, Inc. v. Rhode Island, 481 F.3d 1, 4 (1st Cir. 2007) (quoting Cohen v. Brown Univ., 101 F.3d 155, 169 (1st Cir. 1996)).  The parties will have opportunities to present further evidence and renew arguments as the case progresses. Re-Ace, Inc. v. Wheeled Coach Indus., Inc., 363 F.3d 51, 58 (1st Cir. 2004); Luis Rosario, Inc. v. Amana Refrigeration, Inc., 733 F.2d 172, 173 (1st Cir. 1984).

## I.

JSI is the largest food-service distributor in Puerto Rico.  It receives food-service products directly from manufacturers and producers and delivers them to restaurants,

hotels, and other enterprises that serve food in Puerto Rico.  In 2021, JSI's estimated annual volume of business was about $300 million.

In 1995, JSI became the exclusive distributor for Farmland Foods, Inc. ("Farmland"), food-service products in Puerto Rico.  Farmland produced packaged meat products to be used in the food-service industry.  A letter dated October 10, 1995, from Farmland to JSI confirmed JSI's status as exclusive distributor.

In 2003, Farmland was acquired by Smithfield Foods, Inc., which sold similar lines of meat products under a variety of different brands.  In 2014, Farmland merged with another Smithfield entity, with the surviving company named Smithfield Farmland, Corp.  Smithfield Farmland was then merged into Smithfield Packaged Meats Corp. in 2017.  We refer collectively to the various Smithfield entities involved in this case as "Smithfield."

Although Farmland no longer existed as a company after 2014, for some time Smithfield continued to sell products under the Farmland brand, alongside its other brands.  And while Smithfield and JSI had no written agreement, Smithfield recognized JSI's status as the exclusive distributor for Farmland-branded products until February 2021.  Some of Smithfield's other brands were distributed in Puerto Rico by Ballester Hermanos, Inc. ("Ballester"), at the same time that JSI was distributing Farmland-

branded products.[1]  At least some of the products distributed by Ballester were the same as products distributed by JSI, just under different branding.

The method by which JSI distributed the products remained the same throughout the years.  JSI ordered products by sending a purchase order to Smithfield.  The purchase orders identified the products JSI wanted to order, the relevant quantities, and JSI's understanding of the prices.  They also stated that payment was due twenty-four days after Smithfield sent JSI an invoice.  And they contained an instruction that read, "If you do not agree with prices, terms, qtys, freight and pack sizes in this [purchase order], do not process order until buyer sends you a new [purchase order]."

To fill a purchase order, Smithfield sent the products to JSI's authorized agent in Florida, where JSI took title to the products and assumed all risk.  The products then traveled by ocean freighter to Puerto Rico, where JSI picked them up in its trucks, stored them in its facilities, and delivered them to its clients. On occasion, Smithfield was unable to fill JSI's orders due to shortages of inventory caused by production capacity issues.

---

[1]  The record does not reveal when Ballester began distributing Smithfield's other brands in Puerto Rico or whether Ballester's distribution of these brands was exclusive.

In 2019, Smithfield embarked on what it describes as a "global SKU rationalization process," with the goal of consolidating and reducing the number of brands and redundant products that it sold. Smithfield later accelerated this consolidation due to production issues caused by the COVID-19 pandemic. In October 2019, Smithfield met with JSI to discuss its planned consolidation. Smithfield informed JSI that JSI would continue to be the exclusive distributor for Farmland-branded products in Puerto Rico. JSI insists that Smithfield said that JSI would be the exclusive distributor for any Smithfield products resulting from the consolidation of the Farmland brand. Smithfield maintains that it made clear that JSI would be the exclusive distributor for Farmland products only as long as those products were branded as such, and that it did not promise JSI exclusive rights to the consolidated Smithfield brand.

On May 18, 2020, Smithfield sent its distributors a letter providing notice that a number of its brands -- including Farmland -- would be consolidated into the Smithfield brand. It stated that "the same great products you have come to expect under a variety of names will be consolidated into just a few." JSI requested clarification, and at a meeting Smithfield informed JSI that it intended for both JSI and Ballester to distribute Smithfield-branded products. This prompted JSI, in June 2020, to send a cease-and-desist letter to Smithfield asserting that

- 5 -

selling products previously distributed by JSI to another distributor would violate Puerto Rico's Law 75, which forbids suppliers from impairing their relationships with their distributors in Puerto Rico without just cause.

Smithfield responded to JSI's letter in July 2020. It clarified its position that JSI would remain the exclusive distributor for Farmland-branded products until the brand was withdrawn, but that JSI would not acquire exclusive distribution rights for Smithfield-branded products. It offered JSI a non-exclusive distribution contract for the Smithfield brand in Puerto Rico, noting that it made the same offer to another distributor. JSI refused, contending that it had exclusive distribution rights.

In December 2020, Smithfield sent JSI a notice that the exclusive distribution relationship for Farmland products would terminate on February 1, 2021, when the Farmland products would be consolidated into the Smithfield brand.

Between February 2021 and May 2022, Smithfield continued to fill JSI's purchase orders. JSI ordered -- and Smithfield filled orders for -- about forty types of products during this time period, although the purchase orders themselves fluctuated with respect to products and volumes. It appears from the record that the products that JSI distributed after February 1, 2021, were, in substance, identical or near-identical to the products it

distributed beforehand -- the only material difference being the branding that appeared on the packaging.

In October 2021, with JSI still refusing to agree to a non-exclusive distribution contract for Smithfield products, Smithfield entered into an exclusive distribution contract for certain products in Puerto Rico with Ballester. That contract encompassed many of the products that Smithfield continued to sell to JSI, but it carved out seven products that Smithfield calculated made up the bulk of JSI's purchase volume by weight.[2] Despite the exclusive contract with Ballester, Smithfield for a while continued filling JSI's orders for all products, not just the seven carved-out products.

In February 2022, Smithfield offered an exclusive distribution contract to JSI for the seven carved-out products. JSI declined because it wanted to continue distributing all forty products, rather than limit itself to the seven carved-out products. Smithfield continued to fill JSI's purchase orders.

In late April 2022, Smithfield began notifying JSI that it could not fill JSI's orders because JSI had exceeded its credit limit with Smithfield. Smithfield also sent notices to JSI that it could not fill orders because certain of JSI's payments were

---

[2] Smithfield calculated that in April 2022, the seven carved-out products made up approximately sixty percent of JSI's purchase volume by weight.

past due.[3]  In a June 2022 declaration, Smithfield claimed JSI had paid its invoices an average of 8.75 days late over the prior year, and that those late payments played a role in Smithfield's decision to enter an exclusive distribution agreement with Ballester.  But the first time Smithfield complained about late payments to JSI was on May 2, 2022, more than six months after Smithfield entered into its new agreement with Ballester.  Smithfield continued filling JSI's purchase orders once JSI corrected the credit-limit and late-payment issues.

On May 4, 2022, Smithfield sent JSI an email renewing its February offer to give JSI exclusive distribution rights for the seven carved-out products and stating that if JSI did not accept, JSI must inform Smithfield by May 31, 2022, whether it would agree to be a non-exclusive distributor in Puerto Rico for those products.  The email made clear that, in either case, the terms would be formalized in a written contract.  It stated that Smithfield would "temporarily" receive JSI's orders until May 31, 2022.  JSI understood this to mean that Smithfield would not fill JSI's orders after this date unless JSI agreed to a written distribution contract for the seven carved-out products.  The deadline was later extended to June 15, 2022.

---

[3]  These were two separate issues; because JSI had twenty-four days to complete payment, it was possible for JSI to be over its credit limit while still being current on payment.

JSI did not accept Smithfield's offers, instead opting to file suit against Smithfield in the U.S. District Court for the District of Puerto Rico.  Among other allegations, JSI contends that Smithfield violated Law 75, first by revoking JSI's status as exclusive distributor and selling the same products to another distributor in Puerto Rico, and then by conditioning the filling of JSI's orders on JSI's agreement to limit those orders to the seven carved-out products.  JSI moved for a preliminary injunction under Law 75 to preserve the status quo -- i.e., Smithfield's filling of JSI's orders for all forty products on a non-exclusive basis -- while the case was litigated.  It contends that absent an injunction, JSI would have to establish relationships with new suppliers and would lose its reputation as a reliable source of products.  In 2021, JSI's annual sales of Farmland and Smithfield products totaled about $13 million.

The district court denied JSI's motion for a preliminary injunction.  JSI timely appealed.  We have jurisdiction under 28 U.S.C. § 1292(a)(1).

## II.

Puerto Rico's Law 75 "'governs the business relationship between principals and the locally appointed distributors that market their products.'  The statute was enacted to avoid 'the inequity of arbitrary termination of distribution relationships once the designated dealer had successfully developed a local

market for the principal's products and/or services.'"  Medina &
Medina Inc. v. Hormel Foods Corp., 840 F.3d 26, 41 (1st Cir. 2016)
(cleaned up) (quoting Irvine v. Murad Skin Rsch. Lab'ys, Inc., 194
F.3d 313, 317 (1st Cir. 1999)).

        In furtherance of that goal, the statute allows courts
to grant preliminary injunctions "ordering any of the parties, or
both, to continue, in all its terms, the relation established by
the dealer's contract, and/or to abstain from performing any act
or any omission in prejudice thereof."  P.R. Laws Ann. tit. 10,
§ 278b-1.  In determining whether to grant such a remedy, Law 75
instructs the court to "consider the interests of all parties
concerned and the purposes of the public policy contained in this
chapter."  Id.  Thus, "[a] preliminary injunction under this
statutory provision 'is not tied to a showing of irreparable injury
or to probability of success in the case on the merits, but rather
to the policies of the Act in promoting the continuation of
dealership agreements and the strict adherence to the provisions
of such agreements.'"  Waterproofing Sys., Inc. v. Hydro-Stop,
Inc., 440 F.3d 24, 33 (1st Cir. 2006) (quoting DeMoss v. Kelly
Servs., Inc., 493 F.2d 1012, 1015 (1st Cir. 1974)).  This is the
substantive standard we apply in this diversity case.  Id.

        "While the statute does not require a finding of
likelihood of success as a prerequisite to issuance of an
injunction, the court's view of the merits would certainly affect

its judgment of the weight of the parties' interests and of the injunction's effect on the statutory policies." Luis Rosario, 733 F.2d at 173 (quoting Pan Am. Comput. Corp. v. Data Gen. Corp., 652 F.2d 215, 217 (1st Cir. 1981)).  Indeed, it is hard to see how an injunction would further the policies of the statute if it prevented a principal from taking an action that the statute allows.  For that reason, we assess JSI's likelihood of success on the merits before analyzing, in light of that assessment, the interests of the parties and the purposes of Law 75.

        The district court found JSI unlikely to succeed on the merits and, due largely to that unlikelihood, it concluded that the parties' interests and Law 75's public policy weighed against issuing an injunction.  We review this decision for "abuse of discretion, with conclusions of law reviewed de novo and findings of fact for clear error." Trafon Grp., Inc. v. Butterball, LLC, 820 F.3d 490, 493 (1st Cir. 2016).

**III.**

        Law 75's protections extend only to "dealers."  A "dealer" is a "[p]erson actually interested in a dealer's contract because of his having effectively in his charge in Puerto Rico the distribution, agency, concession or representation of a given merchandise or service." P.R. Laws Ann. tit. 10, § 278(a).  In turn, a "dealer's contract" is a "[r]elationship established between a dealer and a principal or grantor whereby and

irrespectively of the manner in which the parties may call, characterize or execute such relationship, the former actually and effectively takes charge of the distribution of a merchandise, or of the rendering of a service, by concession or franchise, on the market of Puerto Rico." P.R. Laws Ann. tit. 10, § 278(b). A dealer's contract need not be in writing. Medina & Medina, 840 F.3d at 47 n.16 ("Law 75 does not require an agreement to be in writing for its terms to have legal effect.").

Once a dealer's contract has been established, Law 75 prohibits a principal from "directly or indirectly perform[ing] any act detrimental to the established relationship or refus[ing] to renew said contract on its normal expiration, except for just cause." P.R. Laws Ann. tit. 10, § 278a. The statute presumes impairment in several circumstances, including "when the principal or grantor unjustifiably refuses or fails to fill the order for merchandise sent to him by the dealer in reasonable amounts and within a reasonable time." P.R. Laws Ann. tit. 10, § 278a-1(b)(3).

Our case law has clarified that Law 75's protections do not extend beyond the scope of the parties' contract. We have said that "the 'established relationship' between dealer and principal is bounded by the distribution agreement, and therefore the Act only protects against detriments to contractually acquired rights." Vulcan Tools of P.R. v. Makita USA, Inc., 23 F.3d 564, 569 (1st Cir. 1994). "The protection afforded distributors under

- 12 -

Law 75 . . . is 'circumscribed by those rights acquired under the agreement regulating their business relationship.'  Thus, 'whether or not an impairment has taken place will depend upon the specific terms of the distribution contract.'"  Medina & Medina, 840 F.3d at 41 (citations omitted) (quoting Irvine, 194 F.3d at 318).  Said differently, "[t]he question whether there has been a 'detriment' to the existing relationship between supplier and dealer is just another way of asking whether the terms of the contract existing between the parties have been impaired."  Vulcan Tools, 23 F.3d at 569.

That being said, Law 75 allows principals to impair the established relationship only if they can show they had "just cause" to do so.  P.R. Laws Ann. tit. 10, § 278a; see R.W. Int'l Corp. v. Welch Foods, Inc., 88 F.3d 49, 52 (1st Cir. 1996) (Welch II) ("[O]nce a dealer demonstrates that its principal unilaterally terminated their contract, the principal must carry the burden of persuasion on the factual elements of the 'just cause' showing.").  "Just cause" is defined in the statute as "[n]onperformance of any of the essential obligations of the dealer's contract, on the part of the dealer, or any action or omission on his part that adversely and substantially affects the interests of the principal or grantor in promoting the marketing or distribution of the merchandise or service."  P.R. Laws Ann. tit. 10, § 278(d).  Of course, just as the parties' agreement may

circumscribe the extent of the dealer's rights, so too the agreement, by allowing certain conduct or inaction by the dealer, may circumscribe the ability of the principal to deem such conduct or inaction just cause.

To summarize, to prove a violation of Law 75, a party must show that it is a dealer (with a dealer's contract), and that the principal refused to renew or impaired the terms of the existing contract between the parties. Once this has been shown, the principal may avoid liability by proving that it had just cause for its nonrenewal or impairment of the contract.

**A.**

The district court found JSI to be a dealer based on the following facts:

> JSI promotes Farmland and Smithfield products, keeps an inventory of them in its warehouses, fixes the price at which it sells them, delivers them to its clients, bills its clients, extends credit to its clients, has a Foodservice Sales Marketing Program agreement with Smithfield where Smithfield reimburses it a small sum for advertising costs, assumes the risk before the products enter Puerto Rico, purchases the products from Smithfield, and maintains its own facilities. Needless to say, JSI has total control over the products' distribution in Puerto Rico.

José Santiago Inc. v. Smithfield Foods, Inc., No. 22-1239, 2022 WL 2155023, at *4 (D.P.R. June 15, 2022). Smithfield does not contest the district court's finding that JSI is a dealer, and we therefore assume it to be so.

Smithfield does argue, however, that JSI did not have a "dealer's contract."  The district court assumed that a non-exclusive distribution contract existed between the parties, although it noted its skepticism that such a contract existed. See id. ("JSI has not accepted any offer to form one and the inconsistency in the parties' dealings make it more likely that each product purchase constitutes a contract.").  Smithfield argues that JSI consistently rejected Smithfield's offers for a non-exclusive distribution contract and the parties never accepted master terms governing their relationship.  Therefore, Smithfield contends, "the parties effectively dealt on a purchase order-by-purchase order basis."

Smithfield does not explain how JSI could be a dealer without a dealer's contract, given that the statutory definition of "dealer" requires that a dealer be "actually interested in a dealer's contract."  P.R. Laws Ann. tit. 10, § 278(a).  Moreover, the statutory criteria for being a dealer and having a dealer's contract are essentially identical:  One would be hard pressed to come up with a scenario in which an actor has "effectively in his charge in Puerto Rico the distribution, agency, concession or representation of a given merchandise or service" but is not part of a relationship in which that actor "actually and effectively takes charge of the distribution of a merchandise, or of the rendering of a service, by concession or franchise, on the market

of Puerto Rico." P.R. Laws Ann. tit. 10, § 278(a)-(b). And
Smithfield does not point us to any such scenario. So the same
facts that establish JSI's status as a dealer give rise to a
relationship constituting a dealer's contract.

More fundamentally, Smithfield's argument premised on
the absence of a formal offer and acceptance fails because Law 75
recognizes a dealer's contract "irrespectively of the manner in
which the parties may call, characterize or execute such
relationship." P.R. Laws Ann. tit. 10, § 278(b). The dealership
relationship here was not established through a formal offer and
acceptance, but rather through the parties' course of dealing
described above that led to "JSI [having] total control over the
products' distribution in Puerto Rico." José Santiago, 2022 WL
2155023, at *4; see R.W. Int'l Corp. v. Welch Food, Inc., 13 F.3d
478, 482-83 (1st Cir. 1994) (Welch I) (holding that Law 75 applied
where plaintiff had been performing functions of a dealer, even
though parties had not agreed on essential terms).

Nor does JSI's refusal to sign a written non-exclusive
distribution agreement negate the relationship established by the
parties' conduct, as Smithfield argues. JSI declined Smithfield's
offer of a written non-exclusive distribution agreement because it
claimed that it was already an exclusive distributor protected by
Law 75. Indeed, in June 2020, JSI sent Smithfield a cease-and-
desist letter taking the position that selling products to another

distributor would violate Law 75 by impairing JSI's exclusive distribution rights. Refusing to consent to a non-exclusive distribution arrangement because one believes one has exclusive distribution rights can hardly be construed as renouncing any distribution relationship whatsoever. See, e.g., Re-Ace, 363 F.3d at 53, 58 (affirming preliminary injunction under Law 75 where a dealer with exclusive distribution rights rejected an offer to make the agreement non-exclusive).

In sum, we think it likely that JSI is a dealer with a dealer's contract. We turn next to the terms of that contract.

**B.**

JSI contends that it had a contractual right to have Smithfield fill its orders for the approximately forty products that JSI had been distributing prior to May 2022. Therefore, JSI argues, Smithfield violated the parties' contract and Law 75 by conditioning its filling of JSI's orders on JSI's agreement to a written contract for only the seven carved-out products.

Smithfield argues that no such contractual right existed. It describes the parties' relationship following Smithfield's termination of the exclusive distribution agreement as "purchase order-by-purchase order," such that each of JSI's purchase orders was an offer that Smithfield was free to accept, modify, or decline.

With no written contract, the law looks to the parties' "course of dealing to discern the terms of the agreement." Medina & Medina, 840 F.3d at 46 n.15. In so doing, the district court determined that JSI did not have a contractual right to have Smithfield fill its orders:

> The problem here is that we see no pattern or consistency in the parties' course of dealing. There is no minimum product volume that JSI must purchase. There is no minimum product volume that Smithfield must sell. There are no circumstances under which Smithfield must fill JSI's purchase orders. Indeed, Smithfield can refuse to fill a purchase order if it disagrees with JSI's terms. JSI's product needs cannot be forecasted from Smithfield's sales-tracking software because its purchases vary so greatly. The short of it is that we see no contractually acquired rights at all. For JSI is not obligated to place orders and Smithfield is not obligated to fill them.

José Santiago, 2022 WL 2155023, at *4. The following factual findings provided the basis for the district court's determination:

> Neither the exclusive distribution contract nor the nonexclusive one has set terms as to product volume, type, or price. And the volumes and types of products that JSI orders have fluctuated greatly. Moreover, JSI's purchase orders state that Smithfield should not process an order if it disagrees with JSI's offered price, quantity, freight, or pack sizes. Smithfield sometimes declines to fill JSI's purchase orders for one reason or another. There have been times, for example, when JSI has reached its credit limit or Smithfield has disagreed with the terms in JSI's purchase orders. The only consistent

term has been "NET 24," meaning that payment
is due twenty-four days after the invoice
date.  Paying on time is a part of their
relationship.

Id. at *2.  Thus, the district court determined that JSI did not
have a right to have its orders filled because JSI's orders
fluctuated with respect to volumes and types of products, and the
purchase orders allowed Smithfield to decline to fill an order if
it disagreed with its terms (which Smithfield did on occasion).
The district court found that the only consistent term was that
JSI had to pay within twenty-four days of the invoice.

We review the district court's factual findings for
clear error.  "A finding is clearly erroneous when although there
is evidence to support it, the reviewing court on the entire
evidence is left with the definite and firm conviction that a
mistake has been committed." García Pèrez v. Santaella, 364 F.3d
348, 350 (1st Cir. 2004) (quoting Lundquist v. Precision Valley
Aviation, Inc., 946 F.2d 8, 11 (1st Cir. 1991)); see Anderson v.
City of Bessemer City, 470 U.S. 564, 573 (1985).  Although "[w]e
do not lightly reverse a district court's holding when reviewing
for clear error," United States v. Winston, 444 F.3d 115, 122 (1st
Cir. 2006), we think this case meets the standard.

JSI has a long history of placing orders with Smithfield,
and Smithfield has a long history of filling those orders.  This
has occurred since 2003, when Farmland became part of the

Smithfield corporate umbrella. As the district court found, "[w]hen it wants to receive products, JSI sends a purchase order to Smithfield" and, "[i]f Smithfield approves the order, it sends the products to JSI's authorized agent in Jacksonville, Florida." José Santiago, 2022 WL 2155023, at *2. The district court found that this relationship "has not changed throughout the years," id., which is consistent with testimony from JSI's president that this aspect of the parties' relationship has not changed. After Smithfield purported to terminate JSI's exclusive distribution contract for Farmland products, it continued to fill JSI's orders in the same way it had done before, and for the same types of products (albeit in at least some instances under different branding). Indeed, Smithfield continued selling the same products to JSI even after Smithfield had entered into an exclusive distribution agreement with Ballester.

Smithfield claims to have continued filling JSI's orders since February 2021 only "out of courtesy" and in hopes of eventually reaching an agreement. But Smithfield points to no evidence showing that it ever communicated to JSI that it was filling orders out of courtesy on an order-by-order basis, rather than as a continuation of the parties' longstanding relationship. The parties' course of dealing is to be defined by their observable behavior, rather than any subjective, unexpressed intent that one of them claims to have had. See, e.g., P.R. Tel. Co. v. SprintCom,

- 20 -

*Inc.*, 662 F.3d 74, 91 (1st Cir. 2011) ("In determining 'the intention of the contracting parties, attention must principally be paid to their *acts*, contemporaneous and subsequent to the contract.'" (emphasis added) (quoting P.R. Laws Ann. tit. 31, § 3472)); *Nadherny* v. *Roseland Prop. Co.*, 390 F.3d 44, 51 (1st Cir. 2004) ("The unexpressed intention of one party is not binding on the other party to a contract."). And the evidence in the record strongly suggests that Smithfield continued filling JSI's orders after February 2021 in the exact same manner as it had done before.

The district court found no pattern or consistency in the parties' course of dealing because the products and volumes in JSI's purchase orders have fluctuated. Smithfield submitted evidence of this fluctuation between February 2021 and May 2022, which it says reflects the order-by-order nature of the relationship during this time period. We think this too narrow a focus. The relevant pattern or consistency is Smithfield's continued behavior of filling the purchase orders containing products outside of the seven carved-out products. After all, as JSI points out, it makes sense that products, volumes, and prices would vary along with market conditions and consumer demand. Moreover, Smithfield proffers no evidence showing that the fluctuation in JSI's orders was new as of February 2021 and that

JSI's orders did not always vary in this manner -- even under the exclusive distribution agreement for Farmland products.

The district court also placed much weight on the purchase orders' statements that Smithfield could decline to fill an order if it disagreed with certain terms. But the language instructing Smithfield to "not process order until buyer sends you a new [purchase order]" did not allow Smithfield to decline to fill an order at its pleasure. Rather, if the information in the purchase order was inaccurate, or if Smithfield was unable to fill the order, it directed Smithfield to hold off on processing the order until JSI sent a new one that was accurate and fillable. This is perfectly consistent with an expectation that Smithfield would fill JSI's orders so long as they were accurate and Smithfield was able to do so. Moreover, that same language appeared in the purchase orders JSI sent to Smithfield before February 2021. Smithfield would have a hard time convincing a trier of fact that the same words meant two different things at two different times.

In addition, when Smithfield occasionally did not fill JSI's orders, it was either because Smithfield had a shortage of inventory due to production capacity issues or because JSI had exceeded its credit limit or was behind on payments. In the latter scenario, Smithfield filled the orders once JSI paid. So JSI had a reasonable expectation, based on Smithfield's outward conduct

and the parties' course of dealing, that Smithfield would fill an order if it was able to do so and JSI was current on payments (at least until JSI received Smithfield's May 4, 2022, email).

Based on the foregoing, the record leaves no room for doubt that Smithfield's filling of JSI's orders was part of the contractual relationship between the parties. The district court therefore clearly erred in concluding that JSI's right to have Smithfield fill its orders was not part of the parties' "established relationship."

### C.

The district court also concluded that, even if Smithfield were obligated to fill JSI's orders, it would have just cause to impair the contract by refusing to fill them. It found two independent bases for just cause: JSI's failure to make timely payments and the parties' bona fide impasse in negotiations. We address each basis in turn.

### 1.

"'[P]aying for goods on time normally is one of the essential obligations of the dealer's contract,' the non-fulfillment of which can constitute just cause under Law 75. However, we have recognized an exception in those unusual cases where 'a supplier does not care about late payments.'" Waterproofing Sys., 440 F.3d at 29 (quoting PPM Chem. Corp. of

P.R. v. Saskatoon Chem., Ltd., 931 F.2d 138, 139-40 (1st Cir. 1991)).

The district court concluded that timely payment was more likely than not an essential term of the parties' contract, despite Smithfield's history of tolerating late payments:

> Smithfield has a history of tolerating late payments, but it recently refused to fill orders until JSI made payments on its overdue invoices.  Though there appears to be a genuine factual issue about whether timely payment was an "essential" obligation of their contract, we think it more likely that it is because Smithfield, without objection from JSI, has at times refused to fill JSI's orders until it paid overdue invoices.  So Smithfield does care about timely payment.  Moreover, JSI said that paying on time is part of their relationship.

José Santiago, 2022 WL 2155023, at *5.

JSI argues that Smithfield's complaints about late payments were a mere pretext for its impairment of the distribution relationship.  See Waterproofing Sys., 440 F.3d at 29-30 (affirming grant of preliminary injunction where lower court found that the "claim of just cause on the basis of late payments was merely a pretext," despite disagreeing with the lower court's conclusion that the defendant did not care about late payments).

Smithfield claimed in a declaration in June 2022 that JSI had paid its invoices an average of 8.75 days late over the prior year.  And Smithfield's senior management evidently knew about JSI's late payments at least as of October 2021, because its

vice president of distributive sales declared that JSI's late payments played a role in Smithfield's decision to enter an exclusive distribution agreement with Ballester. But despite being aware of JSI's late payments, Smithfield never said anything about late payments to JSI until two days before sending the email that JSI contends impaired its rights. And once Smithfield received payment, it resumed filling JSI's purchase orders.

In addition, Smithfield has made abundantly clear during this litigation -- both before the district court and on appeal -- that it would prefer to continue its relationship with JSI, albeit only with respect to the seven carved-out products. There is at least some tension between Smithfield's desire to continue doing business with JSI and its suggestion that JSI's late payments were a "critical issue" that led to Smithfield's decision to limit JSI's orders to seven items making up approximately sixty percent of Smithfield's sales volume to JSI by weight.

JSI's contention that its late payments did not justify impairing the contract thus has considerable force. Whether it has enough force to render the district court's finding to the contrary clear error is a close call. Ultimately, though, it is not a call we need make. Rather, as we will next explain, we can affirm based on the district court's second rationale for finding just cause: a bona fide impasse in negotiations over exclusivity.

**2.**

The district court found additional just cause for impairment due to the parties' dispute over exclusivity. Although JSI's present motion for a preliminary injunction seeks only to enforce a non-exclusive distribution agreement, at the time the parties were negotiating JSI demanded exclusivity after Smithfield's brand consolidation. And our holding above that JSI continued to be a dealer with a contractual right to have Smithfield fill its purchase orders has no bearing on whether JSI's distribution rights were exclusive after the brand consolidation. For reasons we now explain, we agree with the district court that the parties' dispute over exclusivity constituted just cause for Smithfield to impair the distribution relationship.

A strict read of the statutory definition of "just cause" reveals just two types of actions, both on the part of the dealer, that give rise to just cause: "[n]onperformance of any of the essential obligations," and actions that "adversely and substantially affect[] the interests of the principal." P.R. Laws Ann. tit. 10, § 278(d). But "[a]lthough Law 75, by its plain terms, makes the 'just cause' inquiry turn solely on the dealer's actions or omissions, the Puerto Rico Supreme Court has read a 'third' 'just cause' into the statute to avoid constitutional invalidation, by holding that a principal's own circumstances may permit its unilateral termination of an ongoing

dealership, irrespective of the dealer's conduct." Welch II, 88 F.3d at 52 (citation omitted) (citing Medina & Medina v. Country Pride Foods, Ltd., 858 F.2d 817, 822-23 (1st Cir. 1988)); see V. Suarez & Co. v. Dow Brands, Inc., 337 F.3d 1, 4 (1st Cir. 2003) ("[A] plain reading of Act 75 would produce, in some situations, absurd and constitutionally suspect results.  As a consequence, the courts have filled in other readings.").

The foundational case in this area is Medina & Medina v. Country Pride Foods, Ltd.,[4] in which the Supreme Court of Puerto Rico analyzed a distribution contract of indefinite term with product prices left open to negotiation.  858 F.2d at 818 (reproducing in full the official translation of the court's decision).  The parties periodically set prices by mutual agreement, and prices fluctuated with changes in the Georgia market, a recognized industry guideline.  Id.  At one point when the principal demanded higher prices, the parties negotiated in good faith but failed to reach an agreement.  Id. at 818-19.  The principal then withdrew from the Puerto Rico market, and the dealer sued for terminating the distribution relationship without just cause.  Id. at 819.

---

[4] This Medina & Medina case, from 1988, is distinct from the 2016 Medina & Medina case cited earlier in this opinion.  We will refer to it as "Medina & Medina (1988)."

In response to a certified question from this court, the
Supreme Court of Puerto Rico considered whether a principal's
withdrawal from the Puerto Rico market in light of a bona fide
impasse in negotiations with its dealer could constitute "just
cause" under Law 75. Id. The court observed that it "would raise
serious constitutional objections" if Law 75 "turn[ed] dealerships
into interminable relationships," such that principals "would be
subjected to live in perpetual symbiosis with the distributors
under all types of circumstances." Id. at 822-23. Acknowledging
that "the lawmaker's foresight is not always absolute" and that
"on occasions this Court has had to put some contents into the
statute," the court looked to the purposes of Law 75 to overcome
this potential constitutional hurdle. Id. at 821-23. It observed
that "[t]he principal-dealer relationship is one of collaboration
in the distribution and sale of a product" and that the parties
"are not connected by any dependency agreement or relationship
subordinating one enterprise to the other." Id. at 822. In light
of that relationship, the court stated:

> We cannot possibly construe the statute in
> such a way that the dealer would govern -- by
> imposing his conditions -- the principal's
> sales policies, or vice[ ]versa, with the
> inevitable loss of the financial and legal
> autonomy of both. Such interpretation would
> be contrary to public order because it would
> place an unreasonable restriction on man's
> free will.

Id. at 823. Accordingly, the court held that Law 75

> does not bar the principal from totally
> withdrawing from the Puerto Rican market when
> his action is not aimed at reaping the good
> will or clientele established by the dealer,
> and when such withdrawal -- which constitutes
> just cause for terminating the
> relationship -- is due to the fact that the
> parties have bargained in good faith but have
> not been able to reach an agreement as to
> price, credit, or some other essential element
> of the dealership.

Id. at 824.  The court went on to state that such a termination "must be preceded by a previous notice term which shall depend on the nature of the franchise, the characteristics of the dealer, and the nature of the pre-termination negotiations."  Id.

Subsequent decisions of the Supreme Court of Puerto Rico and this court have clarified and expanded the holding of Medina & Medina (1988) to continue making just cause under Law 75 a workable concept.  In Borg Warner International Corp. v. Quasar Co., 138 D.P.R. 60 (P.R. 1995), the Supreme Court of Puerto Rico clarified that proposed changes in contractual terms motivated by the principal's business circumstances may lead to an impasse constituting just cause, where such proposed changes are reasonable and made in good faith.  There, a drop in the sale of products led to a corporate reorganization by the principal's parent company.  Borg Warner, Official Translation at 2-3.  As a result, the dealer's source of products shifted from the original principal to an affiliated company, and this shift came with various changes to the terms of distribution.  Id. at 3, 14.  The

dealer objected and, after negotiations between the dealer and the affiliate broke down, the principal withdrew from the Puerto Rico market.  Id. at 7.  The court held that the principal had just cause to terminate the relationship because the proposed changes in corporate structure and the terms of distribution were reasonable and made in good faith.  Id. at 10–17, 24.  In so holding, the court emphasized that the purpose of Law 75 requires that a supplier have "the necessary leeway . . . to organize and reorganize his distribution chain efficiently and economically."  Id. at 24.  Law 75, the court stated, "cannot serve as a straitjacket, restricting . . . every move the principal makes without taking into consideration justifiable situations."  Id.

We later held that a principal's business circumstances may justify termination even where no negotiation between the parties has occurred.  In V. Suarez, the principal terminated the distribution relationship because it sold the product lines being distributed to another company, which did not agree to assume the distribution agreement.  337 F.3d at 3.  Due to confidentiality obligations, the principal did not inform the dealer of this sale until it had already occurred, so there was no opportunity for negotiation (nor were there any terms to negotiate).  Id.  We held that the principal's termination of the product line constituted just cause for terminating the relationship.  Id. at 9.  We

rejected the dealer's argument that good-faith negotiation was a prerequisite for just cause under these circumstances, stating:

> Here, either negotiation would be meaningless or the plaintiff dealer would acquire leverage it would not otherwise possess.  This latter effect would create a new imbalance of power, making the entirely legitimate and unrelated corporate interests of the principal in divesting itself of a product line subject to the interests of dealers.  To read the Act to require such a result could discourage national and multinational companies from entering into distributorship agreements subject to Act 75 in Puerto Rico.

Id. at 8.  Requiring the principal to negotiate with the dealer before engaging in its legitimate and unrelated business decision, we reasoned, "would be directly contrary to two stated purposes of the statute: encouraging a level playing field and not creating new power in the dealer."  Id. at 7.

The notice requirement from Medina & Medina (1988) has also been limited.  See V. Suarez, 337 F.3d at 9 (no notice required where "there was little reliance by [the dealer] on this line of business, and there was little [the dealer] could have done to prepare for this termination had it received advance notice"); Borg Warner, Official Translation at 18–19 (no notice required where dealer was the one who refused to purchase products and practically forced the principal to withdraw from the market).

Finally, we have held that the principal need not leave the Puerto Rico market, and can instead engage a new dealer, as

long as the principal's action "is not aimed at reaping the good will or clientele established by the dealer." Welch I, 13 F.3d at 484 n.4 (quoting Medina & Medina (1988), 858 F.2d at 824); see Welch II, 88 F.3d at 53-54.

These cases collectively suggest a flexible approach to just cause under Law 75.[5]  See, e.g., Welch I, 13 F.3d at 484 ("Law 75 simply requires a supplier to justify its decision to terminate a dealership."). This approach fits with the purposes of Law 75 identified in the case law, i.e., leveling the playing

---

[5]  The approach to Law 75's "just cause" provision in Medina & Medina (1988) and the line of cases just described is in stark contrast to the Supreme Court of Puerto Rico's earlier approach in Warner Lambert Co. (Am. Chicle Co. Div.) v. Superior Ct. of P.R., 1 P.R. Offic. Trans. 527 (1973), where the court stated:

> It should be noted that the just cause is limited to acts imputable to the dealer. Only when the dealer fails to comply with any of the essential conditions or adversely affects in a substantial manner the interest of the principal, may the latter terminate the contract without payment for damages. The Act does not admit the good faith of the principal in the termination of the contract, nor his right to establish his own distribution system or to make adjustments in the system which in good faith he considers necessary to improve his market.

Id. at 556. We adhere to the more recent approach in Medina & Medina (1988) and subsequent decisions from the Supreme Court of Puerto Rico and this court. See Salvador Antonetti Zequeira, A Different Opinion About "Just Cause", 58 Rev. Jur. U. P.R. 625, 628-29 (1989) (describing the court's shift from the "literal reading" of Warner Lambert to the "more flexible approach" in later cases).

field between suppliers and dealers and ensuring that suppliers do not arbitrarily impair existing distribution relationships, while at the same time avoiding the subordination of one enterprise to the other and the creation of new power in dealers over suppliers' legitimate business decisions.  See Medina & Medina (1988), 858 F.2d at 820-23; Borg Warner, Official Translation at 24; V. Suarez, 337 F.3d at 7-8.

With this in mind, we turn to the matter at hand in this case.  The district court found that Smithfield had just cause to impair the parties' distribution contract because JSI's refusal to accept a written, non-exclusive distribution contract constituted a bona fide impasse in negotiations.  José Santiago, 2022 WL 2155023, at *5.  It found that "[t]he parties' core dispute concerns brand exclusivity."  Id.  And it found "no evidence that Smithfield's decisions to consolidate its brands, do away with Farmland, and offer JSI a written, nonexclusive distribution contract [were] unreasonable or in bad faith."  Id.

JSI contends this was error for two reasons.  First, JSI argues that its refusal to accept a written contract with terms more detrimental than its existing distribution relationship -- i.e., seven products instead of forty -- cannot possibly constitute just cause for impairing that relationship.  Second, JSI argues that Smithfield's actions were aimed at reaping the goodwill and clientele established by JSI because Smithfield

- 33 -

essentially handed to Ballester all of JSI's work promoting Farmland and then Smithfield products in Puerto Rico.

JSI's first objection takes too narrow a focus. The core impasse that the district court found constituted just cause was not JSI's refusal to accept seven products instead of forty, but rather the parties' unresolved dispute over exclusivity after Smithfield's brand consolidation. That dispute arose because Smithfield embarked on a national consolidation of brands to eliminate redundancies in its product lines, which meant that the Farmland brand that JSI had been distributing exclusively would be merged with other brands distributed by other distributors (including Ballester in Puerto Rico). The resulting consolidated brands would then be distributed by both JSI and Ballester. JSI claimed this was a breach of its exclusivity rights and a violation of Law 75 and refused to sign a written, non-exclusive distribution agreement. After trying and failing for months to get JSI to agree to a written, non-exclusive contract, Smithfield inked an exclusive deal with Ballester, carving out for the benefit of JSI seven products that made up a substantial portion of JSI's order volume by weight. This exclusive relationship with Ballester is the apparent reason for Smithfield's decision to limit JSI to the seven carved-out products.

We find no error in the district court's findings that Smithfield acted reasonably and in good faith, especially given

the presumption of good faith that exists in Puerto Rico law.  See
Welch II, 88 F.3d at 53; Borg Warner, Official Translation at
10 n.8.  Smithfield's business decision to increase efficiency by
consolidating its brands was reasonable in light of its product
redundancy, particularly considering the production issues that
Smithfield faced during the pandemic.  This business decision was
national in scope -- not limited to Puerto Rico -- and was not
developed with JSI in mind.  See V. Suarez, 337 F.3d at 8 n.11
(giving a dealer power over a principal's legitimate business
decisions "is even harder to justify where the plaintiff dealer
plays a rather minimal role in the principal's overall distributor
network").  Smithfield then found itself with two dealers in Puerto
Rico distributing separate brands that would be merged in the
consolidation.  Smithfield could not grant either dealer exclusive
rights to the consolidated brand without significantly impairing
its agreement with the other.  It was therefore reasonable in this
situation to offer each dealer non-exclusive rights to the
consolidated brand, such that each dealer could continue
distributing the same or similar products bearing the consolidated
brand label.  The district court found that Smithfield made this
offer in good faith, and JSI points to no evidence that persuades
us otherwise.[6]

_____

    [6] JSI does not contend that Smithfield failed to timely
notify JSI of its brand consolidation and the resulting termination

- 35 -

JSI's refusal to agree to a non-exclusive relationship and insistence on exclusivity necessarily meant that Smithfield was not going to end up with multiple distributors for its full product line, as it had initially hoped. Facing this situation, Smithfield decided to essentially divide its product line between its two distributors on an exclusive basis: It granted exclusive rights to Ballester for the majority of the products, while reserving for JSI seven products making up a substantial amount of JSI's purchase volume by weight. Nothing in the record suggests that this was anything less than a rational way for Smithfield to resolve the dilemma caused by JSI's resistance to a non-exclusive contract. And we spot no error with the district court's finding that, after JSI continually rejected Smithfield's good-faith attempts at compromise, Smithfield had just cause to impair the relationship due to a bona fide impasse in negotiations.

To hold otherwise would be to render perfectly legal corporate and brand consolidations unduly problematic. Here, for example, two distributors apparently each enjoyed distributing similar products under different brands (and at least JSI did so exclusively). Following the brand consolidation, something had to give: Both distributors could not have conflicting rights over

---

of JSI's exclusive rights to the Farmland brand. And here Smithfield notified JSI of its upcoming consolidation well before it occurred, and kept JSI up to date throughout the process.

the same products.  So unless we are to read Law 75 as precluding good-faith brand consolidations, we must conclude that the law allowed Smithfield to attempt to reallocate distribution rights in a manner that acknowledged the interests of both its distributors and its own legitimate interest in making its products available in Puerto Rico.  Cf. Borg Warner, Official Translation at 23–24.

Nor does JSI persuade us that Smithfield's conduct was aimed at reaping the goodwill and clientele established by JSI. JSI argues that it created a successful market for Farmland-branded products, and then solidified the market for the rebranded Smithfield products after the consolidation.  JSI contends that Smithfield sought to take advantage of this work while cutting JSI out of the picture by partnering exclusively with Ballester.

JSI has failed to present evidence sufficient to establish Smithfield's intent to co-opt JSI's efforts to develop goodwill and clientele.  See, e.g., V. Suarez, 337 F.3d at 6–7 ("The district court correctly found that Suarez had not presented evidence that Dow was attempting to take advantage of or profited from the good will and clientele Suarez had developed. Importantly, Suarez does not allege that Dow at any time acted in bad faith.").  As described above, Smithfield granted Ballester exclusivity only after trying for months to continue its relationship with JSI on a non-exclusive basis.  And even after signing the exclusive deal with Ballester, Smithfield continued

its efforts to work with JSI by offering JSI exclusive rights to
seven carved-out products that constituted a substantial amount of
JSI's orders by weight.  Moreover, it appears from the record that
Ballester also played a significant role in developing the market
for the packaged meat products in Puerto Rico, both before the
brand consolidation (for non-Farmland brands under the Smithfield
umbrella) and after (for the consolidated Smithfield brand).  So
if Smithfield had acceded to JSI's demand for exclusivity, and
JSI's interpretation of Law 75 were accurate, Smithfield could
well have faced this same lawsuit, only with Ballester as
plaintiff.

In sum, the district court correctly concluded that
Smithfield would likely succeed in showing just cause to impair
its distribution relationship with JSI based on the parties' bona
fide impasse in negotiations as to exclusivity.  The district court
therefore did not abuse its discretion in finding that JSI has a
low likelihood of success on the merits.

**IV.**

As stated above, the plaintiff's likelihood of success
on the merits in a Law 75 action bears heavily on the weight of
the parties' interests and whether an injunction would serve the
purposes of Law 75.  Luis Rosario, 733 F.2d at 173.  The district
court concluded that the interests of the parties and the purposes
of Law 75 weighed against entering an injunction in this case

because the merits strongly favored Smithfield.  José Santiago, 2022 WL 2155023, at *6.  It also observed that, although JSI would likely suffer hits to its sales numbers and reputation if Smithfield stopped filling orders, Smithfield's products represented only a small percentage of JSI's total sales.  Id.

Given our analysis of the merits, we find no legal error or abuse of discretion sufficient to justify overruling the district court's balancing of the relevant factors.  As we just described, Smithfield has a strong interest in being free to carry out its legitimate business decision of consolidating its brands nationwide.  And the purposes of Law 75, as interpreted by the Supreme Court of Puerto Rico and this court, do not condone JSI's efforts to obstruct this legitimate business decision by rejecting Smithfield's reasonable, good-faith attempts at negotiation.  See Medina & Medina (1988), 858 F.2d at 822–23; Borg Warner, Official Translation at 23–24; Welch II, 88 F.3d at 52; V. Suarez, 337 F.3d at 7–8.

**V.**

For the foregoing reasons, we affirm the district court's denial of JSI's motion for a preliminary injunction.